NO. 14-2709

IN THE UNITED STATES COURT OF APPEALS

FOR THE THIRD CIRCUIT

———————————

In re: ICL HOLDING COMPANY, INC., et al.,

Debtors

United States of America,

Appellant

———————————

ON APPEAL FROM THE ORDER OF
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

———————————

OPENING BRIEF FOR THE UNITED STATES

———————————

TAMARA W. ASHFORD
  *Acting Assistant Attorney General*

THOMAS J. CLARK          (202) 514-9084
BETHANY B. HAUSER        (202) 514-2830
  *Attorneys, Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

*Of Counsel:*
CHARLES M. OBERLY, III
  *United States Attorney*

11949244.1

# TABLE OF CONTENTS

**Page**

Table of contents ............................................................................i

Table of authorities .......................................................................ii

Statement of subject matter and appellate jurisdiction.........................1

Statement of the issues.................................................................3

Statement of related cases and proceedings...........................................4

Statement of the case ...................................................................4

    A.    The Asset Purchase Agreement.............................................6

    B.    The Term Sheet..................................................................8

    C.    The Bankruptcy Court adopted the Asset Purchase
           Agreement ..........................................................................9

    D.    The Bankruptcy Court adopted the Term Sheet.................12

    E.    The District Court affirmed the orders of the
           Bankruptcy Court ...............................................................13

Summary of argument .................................................................15

Argument:

    The distribution terms contained in the Asset Purchase
    Agreement and the Term Sheet, and the Bankruptcy Court
    orders adopting them, should be modified to conform to the
    priorities established by the Bankruptcy Code

    Statement of the standard or scope of review ...............................19

    A.    Introduction.......................................................................19

    B.    Chapter 11 of the Bankruptcy Code allows for the sale
           of estate property and provides a priority scheme for
           distributing the proceeds from such sales............................22

**Page(s)**

C.    Parties may not use a section 363 sale or a settlement connected to such a sale to alter the priorities established by the Bankruptcy Code .................................... 27

D.    The amounts earmarked for professional fees, for the wind-down of debtors' businesses, and for the unsecured creditors are proceeds of the sale and therefore property of the estate ............................................ 32

E.    Modification of the distribution terms in the sale and settlement orders will not affect the validity of the sale to the purchaser ................................................................. 42

Conclusion ........................................................................................ 48
Certificate of bar membership ................................................................. 49
Certificate of compliance with type volume limitation .......................... 50
Certificate of service ........................................................................... 51

## TABLE OF AUTHORITIES

**Cases:**

*In re Armstrong World Industries, Inc.*,
    432 F.3d 507 (3d Cir. 2005)........................... 19, 31, 38, 39, 40
*In re Armstrong World Industries, Inc.*,,
    320 B.R. 523 (D. Del. 2005)................................................... 40
*Begier v. IRS*,
    496 U.S. 53 (1990) ............................................................... 23
*BMG Music v. Martinez*,
    74 F.3d 87 (5th Cir. 1996) ..................................................... 47
*In re Chrysler LLC*,
    405 B.R. 84 (Bankr. S.D.N.Y. 2009).......................... 29, 30, 31
*Cinicola v. Scharffenberger*,
    248 F.3d 110 (3d Cir. 2001)...................................... 43, 44, 46
*Commissioner v. Danielson*,
    378 F.2d 771 (3d Cir. 1967)................................................... 35
*In re DBSD N. Am., Inc.*,
    634 F.3d 79 (2d Cir. 2011).............................................. 34, 40

## Cases (continued):                                          Page(s)

*Fla. Dep't. of Revenue v. Piccadilly Cafeterias, Inc.,*
   554 U.S. 33 (2008) ................................................................23

*In re General Motors Corp.,*
   407 B.R. 463 (Bankr. S.D.N.Y. 2009).................. 29, 30, 31, 38

*In re Genesis Health Ventures, Inc.,*
   402 F.3d 416 (3d Cir. 2005)...................................................38

*In re Hope 7 Monroe St. Ltd. Partnership,*
   743 F.3d 867 (D.C. Cir. 2014) ...............................................46

*Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.,*
   141 F.3d 490 (3d Cir. 1998)............................................42, 43

*In re Mintze,*
   434 F.3d 222 (3d Cir. 2006)...................................................19

*Motorola, Inc. v. Official Committee of Unsecured Creditors*
   *(In re Iridium Operating LLC),*
   478 F.3d 452 (2d Cir. 2007)............................................28, 30

*In re New Century TRS Holdings, Inc.,*
   407 B.R. 576 (D. Del. 2009)..................................................24

*PBGC v. Braniff Airways, Inc. (In re Braniff,*
   Airways, Inc.), 700 F.2d 935 (5th Cir. 1983) ..................28, 29

*In re SPM Mfg. Corp.,*
   984 F.2d 1305 (1st Cir. 1993).............................. 32, 39, 40, 41

*In re Stadium Mgmt. Corp.,*
   895 F.2d 845 (1st Cir. 1990)..................................................46

*In re Swedeland Dev. Group, Inc.,*
   16 F.3d 552 (3d Cir. 1994)....................................................43

*In re Trism,*
   328 F.3d 1003 (8th Cir. 2003) ..............................................46

*United States v. Noland,*
   517 U.S. 535 (1996) ..............................................................27

*Viera v. Life Ins. Co. of North America,*
   642 F.3d 407 (3d Cir. 2011)..................................................19

*In re WestPoint Stevens, Inc.,*
   600 F.3d 231 (2d Cir. 2010)..................................................45

*In re WR Grace & Co.,*
   729 F.3d 332 (3d Cir. 2013)..................................................23

**Statutes:**                                                                **Page(s)**

Bankruptcy Code (11 U.S.C.):

§ 103 ..................................................................... 22
§ 363 ............................... 3, 4, 6, 10, 16, 18, 21, 22, 23, 27, 28
                                       29, 30, 32, 38, 39, 42, 43, 44, 45, 46
§ 503 ......................................................... 8, 20, 25
§ 507 ..................................................... 8, 20, 24, 25
§ 523 ..................................................................... 20
§ 541 ............................................. 23, 32, 35, 39
§ 547 ..................................................................... 9
§ 726 ..................................................................... 25
§ 1107 ................................................................... 22
§ 1112 ........................................................... 21, 24
§ 1121-1129 ................................................ 8, 20, 22, 23, 24

28 U.S.C.:

§ 157 ..................................................................... 2
§ 158 ............................................................... 2, 3
§ 1334 ................................................................... 2

**Rules:**

Bankruptcy Rule 9019 .......................................... 3, 4, 30

Fed. R. App. P. 4(a) ........................................................ 3

**Miscellaneous:**

7 Allan N. Resnick, Henry J. Sommer, Collier
    Bankruptcy ¶ 1100.01 (16th ed. 2014) ........................... 22, 24

Jacob A. King, *Rethinking 363 Sales*,
    17 Stan. J. L. Bus. & Fin. 258 (2012) ................................. 29

S. Rep. No. 95-989 (1978) ............................................... 25

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————

### No. 14-2709

### In re: ICL HOLDING COMPANY, INC., et al.,

### Debtors

### United States of America,

### Appellant

———————————

## ON APPEAL FROM THE ORDER OF
## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

———————————

## OPENING BRIEF FOR THE UNITED STATES

———————————

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

LCI Holding Co., Inc. (Debtor), and 34 of its subsidiaries, filed

voluntary petitions under Chapter 11 of the Bankruptcy Code (11

U.S.C.) in the United States Bankruptcy Court for the District of

Delaware on December 11, 2012.  (A. 178.)[1]  That same day, the debtors

filed a motion seeking approval of a sale of substantially all their assets.

(A. 299.)  The Bankruptcy Court had jurisdiction under 28 U.S.C.

———————————

[1] "A." references are to the separately bound record appendix.

§§ 157(b) and 1334, and entered an order approving the sale on April 4, 2013.  (A. 32-153.)  Within 14 days, on April 17, 2013, the United States appealed the order to the United States District Court for the District of Delaware.  (A. 28.)  This appeal was docketed in the District Court as No. 13-924.

On April 26, 2013, the Official Committee of Unsecured Creditors moved for an order approving a settlement and approving a Term Sheet.  (A. 514-535.)  The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157(b) and 1334 and entered an order adopting the Term Sheet on May 28, 2013.  (A. 26-27.)  Within 14 days, on June 7, 2013, the United States appealed the order to the United States District Court for the District of Delaware.  (A. 13.)  This appeal was docketed in the District Court as No. 13-1168.

The two appeals were consolidated in the District Court, which had jurisdiction under 28 U.S.C. § 158(a).  (A. 169-175.)  On March 10, 2014, the District Court issued a memorandum opinion affirming the orders of the Bankruptcy Court (A. 5), and it dismissed both appeals (A. 4).  Within 60 days, on May 7, 2014, the United States appealed to

this Court.  (A. 1.)  *See* Fed. R. App. P. 4(a)(1)(B) and 6(b).  This Court's

jurisdiction rests upon 28 U.S.C. § 158(d).

## STATEMENT OF THE ISSUES

Two orders of the Bankruptcy Court, both of which were affirmed

by the District Court, are at issue in this appeal.

1.  In the first order, the Bankruptcy Court approved a sale of

substantially all of the debtors' assets pursuant to Section 363(b) of the

Bankruptcy Code.  That order provided for the payment, out of the

proceeds of the sale, of some administrative expenses to professionals

retained in the bankruptcy proceedings, but made no provision for the

payment of the debtors' capital gains tax liability that would be

incurred on the sale, which was estimated to be $24 million and which

would also be classified as an administrative expense.  The first issue

for appeal is whether the Bankruptcy Court erred in holding that the

proceeds of the Section 363(b) sale were not property of the debtors'

bankruptcy estates, and therefore were not subject to the distribution

rules set forth in the Bankruptcy Code.

2.  In the second order, the Bankruptcy Court approved a

settlement, pursuant to Bankruptcy Rule 9019, in which the purchaser

of the debtors' assets would make a payment of $3.5 million to

unsecured creditors in exchange for the withdrawal of their objections

to the sale, even though no payment would be made on the IRS's higher-

priority administrative tax claim.  The second issue for appeal is

whether the Bankruptcy Court erred in holding that the settlement

proceeds were not property of the debtors' bankruptcy estates, and

therefore were not subject to the distribution rules set forth in the

Bankruptcy Code.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Pursuant to Local Rule 28.1(a)(ii), counsel for the United States

state that this proceeding has not previously been before this Court.

We are unaware of any related cases, except that we believe the

transactions in this case may be used as a model in other bankruptcy

cases.

## STATEMENT OF THE CASE

The Bankruptcy Court approved a sale of substantially all of the

debtors' assets pursuant to Section 363(b) of the Bankruptcy Code.  In a

second order, the Bankruptcy Court approved a settlement, pursuant to

Bankruptcy Rule 9019, in which the purchaser of the debtors' assets

-5-

would make a payment of $3.5 million to unsecured creditors in exchange for the withdrawal of their objections to the sale.  The United States opposed both the sale and the settlement because they proposed to distribute property of the debtors' bankruptcy estates in violation of the Bankruptcy Code's distribution rules; that is, that they were to make substantial payments to some administrative claimants, and even to unsecured creditors, while making no payment at all to the (estimated) $24 million capital gains tax liability that would be incurred on the sale, and that would be classified as an administrative expense. The Bankruptcy Court approved both the sale and the settlement on the ground that the proceeds of neither were property of the debtors' bankruptcy estates, and thus were not subject to the Bankruptcy Court's distribution rules.

The Government appealed both of the Bankruptcy Court's orders to the District Court.  The Government did not ask the District Court to invalidate the sale, but asked only that the proceeds of the sale and the settlement be distributed in accordance with the Bankruptcy Code.  The District Court, however, affirmed both of the Bankruptcy Court's orders.

### A.    The Asset Purchase Agreement

LCI Holding Company, Inc. is the parent company of 34 other corporations ("debtors"), each of which filed a petition under Chapter 11 on December 11, 2012, in the Bankruptcy Court for the District of Delaware.  (A. 178, 263.)  Together, debtors operated 27 long-term acute care hospitals in ten states, and had about 4,500 employees, the majority of whom were registered or licensed nurses and respiratory therapists.  (A. 265-266.)  At the time of their bankruptcy petitions, debtors had debts of $484.2 million, of which about $353.4 million was secured by substantially all their assets.  (A. 267-268.)

Hospital Acquisition, LLC, is an entity formed from debtors' prepetition secured lenders.  On December 10, 2012 – the day before debtors filed for bankruptcy – Hospital Acquisition and debtors signed an "Asset Purchase Agreement" providing that debtors would sell substantially all their assets to Hospital Acquisition.  (A. 67.)  The Asset Purchase Agreement listed three components of the purchase price. (A. 96-97, ¶ 3.1)  One component provided for the release of the secured indebtedness.  (A. 96-97, ¶ 3.1(c))  In other words, this sale was a credit bid.  *See* 11 U.S.C. § 363(k).  A second component provided for the

assumption by Hospital Acquisition of certain liabilities (including, *e.g.*,
real estate leases).  (A. 96, ¶ 3.1(b).)  The final component was "cash
consideration," comprised of professional fees, wind-down expenses, and
outstanding liabilities of the debtor-in-possession.  (A. 96, ¶ 3.1(a).)  The
professional fees consisted of "seller retained professional fees," *i.e.*, the
fees of debtors' lawyers and accountants, through the date of closing, as
approved by the Bankruptcy Court (A. 86, 96) and "committee retained
professional fees," *i.e.*, the fees of lawyers and accountants retained by
the official committee of unsecured creditors (A. 78, 96).  Each of these
amounts, including the amount earmarked for wind-down expenses,
was to be paid into escrow accounts.  (A. 78, 86, 88.)

On the same day they filed their bankruptcy petitions, debtors
asked the Bankruptcy Court to approve the sale to Hospital Acquisition.
(A. 299.)  The United States opposed the motion, and pointed out that,
by disposing of substantially all of debtors' assets, the Asset Purchase
Agreement would eliminate any possibility that the debtors could
confirm a Chapter 11 plan.  The United States also pointed out – and
these points are not controverted – that the proposed sale would result
in capital gains tax liability estimated at $24 million, which would give

rise to an administrative-expense claim (*see* 11 U.S.C. § 503(b)(1)); that the administrative-expense claim would be entitled to second priority in the distribution of debtors' estates (*see* 11 U.S.C. § 507(a)(2)); and that like all other administrative-expense claims, this tax liability would have to be paid in full on the effective date of any plan that might be confirmed under Chapter 11 (*see* 11 U.S.C. § 1129(a)(9)(A)).

## B.    The Term Sheet

The Official Committee of Unsecured Creditors, which had been appointed by the U.S. Trustee, also opposed the proposed sale.  The Committee argued that the secured creditors were "using the Bankruptcy Code to conduct a veiled foreclosure with no benefit to other creditors and are doing so on the backs of the unsecured creditors leaving [the debtors'] estates administratively insolvent."  (A. 492.) Notably, in its objection to the proposed sale, the Committee also complained that "[t]here is no provision for payment of all administrative expenses," and, in particular, that "there is no express provision for payment of accrued payables or capital gains tax that will arise from the sale."  (A. 494.)  At that time, therefore, the Committee and the Government were in complete alignment:  the proposed sale

should not be confirmed because there was no provision for the capital gains tax liability that would arise from the sale.

Debtors and Hospital Acquisition, however, proceeded to purchase the Committee's acquiescence to the sale. In return for the Committee's agreement to support the proposed sale, Hospital Acquisition agreed to provide a fund of up to $3.5 million for distribution to the prepetition unsecured creditors. (A. 532-533.) In addition, the debtors agreed not to pursue any preference actions (*see* 11 U.S.C. § 547) against the unsecured creditors. (A. 533.) This agreement was embodied in a Term Sheet that was submitted to the Bankruptcy Court together with the sale materials (*see* A. 514-515), and then resubmitted in a stand-alone motion as a "compromise of controversy . . . in aid of consummation of court-approved sale of [debtors'] assets." (A. 514.) The Term Sheet expressly stated that the settlement was conditional on the Bankruptcy Court's approval of the sale. (A. 533.)

## C.    The Bankruptcy Court adopted the Asset Purchase Agreement

The Bankruptcy Court held a hearing on the sale, and after hearing arguments from both sides, the court ruled from the bench. (A. 166-167.) Although the court recognized that this was a sale of

substantially all the debtors' assets, the court declined to analyze the matter like the confirmation of a plan.  (A. 167.)  Instead, the court applied the "sound business purpose" analysis ordinarily applied to Section 363 sales.  (A. 167.)  Under this analysis, the court observed, the sale should be approved:  it would continue the businesses in operation as going concerns, a matter of importance to the patients and their communities, and there was an assumption of operating liabilities.  (A. 167.)  The court found that the sale "has clearly been proposed in good faith," and noted that "[t]here is no motion to dismiss or convert the cases."  (A. 167.)  Accordingly, the court concluded, "it is . . . certainly in the best interests of the debtors' estate that the Court approve the sale," and the court did so.  (A. 167-168. )  The court declined, however, to address the Term Sheet at this hearing, suggesting that the settlement hadn't properly been put before the court.  (A. 168.)

On April 4, 2013, the Bankruptcy Court entered an order approving the sale.  (A. 32.)  The Asset Purchase Agreement was incorporated into the order as Exhibit A.  (A. 67.)  The order reiterated the court's conclusion that the sale was "in the best interests of the

Debtors, their creditors, their estates and other parties in interest," and that "[s]ound business reasons exist" for authorizing the transaction. (A. 37.)  These reasons included, that "the Sale Transaction is the only viable alternative to liquidation"; that "any plan would not have likely yielded as favorable an economic result"; and that "[t]he terms and conditions of the Asset Purchase Agreement, including . . . the consideration to be realized by the Debtors, are fair and reasonable" and "in the best interests of the Debtors, their estates and creditors, and all other parties in interest."  (A. 37.)

The order approving the sale provided that Hospital Acquisition could take the properties free and clear of, *inter alia*, claims based on any taxes.  (A. 39-40, 47.)  It also authorized Hospital Acquisition to deposit into escrow accounts cash for the seller-retained professional fees, committee-retained professional fees, and wind down expenses. (A. 60.)  Funds remaining in those accounts after the payment of the fees were to be "paid to the Purchasers without any further order or approval."  (A. 60.)

-12-

### D.   The Bankruptcy Court adopted the Term Sheet

Because the Bankruptcy Court had not addressed the Term Sheet in its order approving the sale, the Committee of Unsecured Creditors moved the Bankruptcy Court for a separate order approving it. (A. 514.)  That motion explained that "[t]he Term Sheet represents an agreement between the Buyer, the Lenders and the Committee to allocate proceeds derived from the sale."  (A. 519.)  The motion explained that "[u]nsecured creditors will benefit greatly if the Term Sheet is approved" by receiving the "aggregate sum of $1.5 million in cash," plus the waiver of avoidance actions, "for total consideration of approximately $2.55 million to $3.95 million."  (A. 524.)  Noteholders, also, would benefit from the settlement, the motion explained, because they "would receive a flat payment of $2 million."  (A. 524.)

At the hearing on this motion, the Bankruptcy Court again ruled from the bench.  (A. 23-25.)  The court acknowledged that the Section 363 sale had stripped the estates of substantially all their assets and, in doing so, it agreed with the central point the Government made in its opposition to the sale:  "No plan is going to be filed in this case.  Let's face it.  There are not sufficient funds for debtors to file a plan.  What's

-13-

going to happen, I assume is a conversion to Chapter 7 in the near

future." (A. 24.)  The court recognized that the effect of the settlement

was that "the purchaser . . . paid . . . for these assets indirectly." (A. 24.)

And it recognized that the settlement was inconsistent with the

absolute priority rule because "the term sheet in fact permits a

distribution directly to the unsecured creditors." (A. 24.)  But the court

took this inconsistency as "an indication that what we are dealing with

here today is not property of the debtors' estate." (A. 24.)  Since the

unsecured creditors would do better receiving a direct payment from

Hospital Acquisition under the settlement than they would receiving an

indirect payment from Hospital Acquisition, via the debtors' estate, in a

hypothetical Chapter 7 liquidation, the Bankruptcy Court approved the

settlement. (A. 24-25.)  On May 28, 2013, the Bankruptcy Court

entered a written order approving the Term Sheet. (A. 26-27.)

### E.    The District Court affirmed the orders of the Bankruptcy Court

The United States timely appealed to the District Court from both

the Bankruptcy Court's order approving the sale and the order

approving the settlement. (A. 13, 26, 28, 32.)  As indicated, the

Government did not ask the District Court to invalidate the sale, but

requested only that the proceeds of the sale and the settlement be distributed in accordance with the Bankruptcy Code's priority rules. The District Court dismissed the appeals.  (A. 4.)  In a memorandum accompanying its order, the court observed that "the controlling issue with respect to the appeal is whether the bankruptcy court correctly found that the funds at issue were not part of debtors' estate."  (A. 7.) On that issue, the District Court stated that the Bankruptcy Court had ruled based on "a voluminous and uncontested record supplemented by the argument and testimony presented at several hearings" that "the funds at issue belonged to the purchaser not the estate."  (A. 7.)  Since the United States did not "present any factual evidence to refute this finding," the District Court affirmed.  (A. 7.)

## SUMMARY OF ARGUMENT

This dispute arises from a Chapter 11 bankruptcy proceeding.  At issue is the proper distribution of funds supplied by the purchaser, Hospital Acquisition, in a transaction in which it acquired substantially all the assets of debtors.  The transaction gave rise to capital gains tax in the amount of approximately $24 million.  It also made the confirmation of a Chapter 11 plan impossible.

In exchange for the assets, Hospital Acquisition agreed to release liabilities secured by those assets.  Hospital Acquisition also agreed to pay certain administrative expenses, including the debtors' professional fees, the professional fees incurred by the committee of unsecured creditors, and debtors' wind-down expenses.  These amounts were characterized in the Asset Purchase Agreement as part of the "purchase price."  After the Committee of Unsecured Creditors objected to the proposed sale, Hospital Acquisition also agreed to pay certain amounts to the unsecured creditors in exchange for their support of the sale.  The motion seeking approval of the settlement characterizes the settlement as "an agreement between the Buyer, the Lenders and the Committee to allocate proceeds derived from the sale."

The Bankruptcy Court approved the sale and settlement. The net result of this transaction was that Hospital Acquisition acquired substantially all of debtors' assets; some administrative expenses were paid (professional fees and wind-down costs); and unsecured creditors obtained some recovery; but the tax liability went unpaid. In short, everyone got paid except the United States. This outcome is in derogation of the priority scheme established by the Bankruptcy Code. The distribution terms included in the sale and settlement therefore should be modified to comport with the priorities established by Congress.

1. Neither the Bankruptcy Court nor the parties to a bankruptcy may alter the priorities established by Congress. A Chapter 11 plan providing for the reorganization or liquidation of a debtor cannot be confirmed unless it comports with these priorities. Section 363 of the Bankruptcy Code also allows for the sale of a debtor's assets prior to confirmation of the plan. But courts do not allow parties to use such section 363 sales to evade the requirements of a plan. Settlement agreements entered (usually between unsecured creditors and the purchaser) also cannot be used to evade these statutory requirements.

2.  The Bankruptcy Court and District Court here concluded that there was no violation of the Bankruptcy Code's priority scheme because the amounts paid by the purchaser in order to acquire substantially all the debtors' assets were not property of the estate. That conclusion is in error.  The bankruptcy estate includes all property of the debtor at the commencement of the case and all proceeds obtained from the disposition of that property.  The parties to the Asset Purchase Agreement specifically described the amounts paid by Hospital Acquisition as part of the "purchase price" of debtors' assets, and the parties to the settlement described that agreement as "an agreement . . . to allocate proceeds derived from the sale."  The courts should have credited the parties' own assertions that these amounts represented payment for debtors' assets.

3.  Finally, this Court has the power to modify the Asset Purchase Agreement, the Term Sheet, and the orders approving them to the extent those documents purport to dictate a distribution of property of the estate that is inconsistent with the priorities established by the Bankruptcy Code.  Absent a stay, the modification on appeal of a sale order generally cannot affect the validity of a sale to the purchaser (and

there was no stay here). But the relief that the United States here seeks will not affect the purchaser's title to the assets, the amount it must pay in order to acquire them, or otherwise affect the purchaser's rights going forward. It will only affect the distribution, among other creditors, of monies that the purchaser has already agreed to part with. That distribution ought to be controlled by the statutory priorities adopted by Congress. Hospital Acquisition's efforts to dictate a different distribution of the monies it paid for the debtors' assets, after the sale has been approved, are not entitled to the protection of Section 363(m).

# ARGUMENT

**The distribution terms contained in the Asset Purchase Agreement and the Term Sheet, and the Bankruptcy Court orders adopting them, should be modified to conform to the priorities established by the Bankruptcy Code**

## Statement of the standard or scope of review

This Court gives plenary review to the decision of a District Court sitting as an appellate court in a bankruptcy proceeding. Therefore, the Bankruptcy Court's conclusions of law are reviewed *de novo* and its findings of fact for clear error. *In re Mintze*, 434 F.3d 222, 227 (3d Cir. 2006). The legal interpretation of contract language is reviewed *de novo*. *Viera v. Life Ins. Co. of North America*, 642 F.3d 407, 413 (3d Cir. 2011). Whether a reorganization plan violates the absolute priority rule is a question of law. *In re Armstrong World Industries, Inc.*, 432 F.3d 507, 511 (3d Cir. 2005).

## A.    Introduction

The transactions at issue in this case, if not an abuse of the bankruptcy process (by squeezing out a federal tax liability of tens of millions of dollars), is certainly at odds with the structure and purpose of Chapter 11. In that chapter, Congress granted "breathing room" to fiscally impaired businesses by affording them the opportunity to either

reorganize or liquidate. But Congress also provided specific rules as to how, and the extent to which, the business's creditors were to be compensated. As relevant here, claims for "administrative expenses" were to have second priority in distribution (following only unsecured claims for domestic support obligations). 11 U.S.C. § 507(a)(1) & (2). Taxes incurred by a bankruptcy estate are included within the definition of administrative expenses. 11 U.S.C. § 503(b)(1)(B)(i). And *all* administrative expenses are to receive the same treatment; Congress made no distinction among them.

There is thus absolutely no basis for permitting the payment in a Chapter 11 case of some administrative expenses – such as seller-retained professional fees, committee-retained professional fees, and wind-down expenses – while leaving nothing for an administrative tax claim. Congress provided that some taxes may be discharged in bankruptcy, such as income taxes for a period for which a return was due to be filed more than three years before bankruptcy. 11 U.S.C. §§ 507(a)(8), 523(a)(1). But it also decided that the type of tax at issue in this case must be paid in full when a business seeks the protection of Chapter 11. 11 U.S.C. § 1129(a)(9)(A) (requiring administrative

expenses to be paid, in cash and in full, on the effective date of a plan). There is no sound business reason for approving a sale in a Chapter 11 case that would leave a debtor unable to meet that obligation. The tax at issue here is every bit as much a normal cost of doing business as the fees of the professionals who negotiated the Section 363 sale, and, indeed, Congress deemed a debtor's inability to pay such a tax as a sufficient cause to either dismiss a Chapter 11 petition or convert the case to Chapter 7. 11 U.S.C. § 1112(b)(4)(I).

The Bankruptcy Court erred in permitting the sale here to go forward without adjusting the distribution terms specified by the debtor and Hospital Acquisition to comply with the priorities established by the Bankruptcy Code. As below, we do not ask the Court to invalidate the sale. *See* 11 U.S.C. § 363(m) (in the absence of a stay, the modification on appeal of an order authorizing a Section 363 sale "does not affect the validity of the sale"). But we do ask the Court to order that the proceeds of the sale, including the amounts paid to the unsecured creditors committee, be distributed in accordance with the rules set forth in the Bankruptcy Code, *i.e.*, a *pro rata* distribution to all administrative claimants.

-22-

**B.    Chapter 11 of the Bankruptcy Code allows for the sale of estate property and provides a priority scheme for distributing the proceeds from such sales**

Chapter 11 of the Bankruptcy Code generally provides the means for a bankrupt debtor either to reorganize its business or to liquidate in an orderly fashion.  *See* 7 Alan N. Resnick, Henry J. Sommer, Collier on Bankruptcy ¶ 1100.01 (16th ed. 2014).  A debtor can do either – reorganize or liquidate – by confirming a plan in compliance with the requirements of Sections 1121-1129 of the Bankruptcy Code.  Pursuant to such a plan, a debtor may sell "all or substantially all of the property of the estate."  11 U.S.C. § 1123(b)(4).  In that case, the plan will also "provide for . . . the distribution of the proceeds of such sale among holders of claims or interests."  11 U.S.C. § 1123(b)(4).

The Bankruptcy Code also permits a Chapter 11 debtor to sell "property of the estate" *before* seeking confirmation of a plan.  On this point, Section 363(b)(1), which applies to all chapters of the Code (*see* 11 U.S.C. § 103(a)), provides that a trustee (and a debtor in possession, *see* 11 U.S.C. § 1107(a)) "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  But the Code provides that the proceeds of a § 363 sale become property

-23-

of the estate.  11 U.S.C. § 541(a)(6) (property of the estate includes "[p]roceeds . . . of or from property of the estate").  Those proceeds therefore must be distributed in compliance with the priorities established by the Bankruptcy Code.  The Supreme Court has thus recognized that, even where a Chapter 11 debtor sells its property under Section 363(b), it "typically submits for confirmation a plan of liquidation (rather than a traditional plan of reorganization) providing for the distribution of the proceeds resulting from the sale." *Fla. Dep't. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 37 n.2 (2008).

"'Equality of distribution among creditors is a central policy of the Bankruptcy Code.'" *In re WR Grace & Co.*, 729 F.3d 332, 343 (3d Cir. 2013) (quoting *Begier v. IRS*, 496 U.S. 53, 58 (1990)).  A plan therefore must group similar claims into classes and provide the same treatment for all claims within each class.  11 U.S.C. § 1123(a)(1), (4).  *See WR Grace*, 729 F.3d at 343 (noting that this provision "mandate[s] some form of equality").  "[I]f claims within the same class are not receiving the same treatment, and the holders of those claims being treated less favorably have not consented to the discrimination, the plan is not

confirmable." *In re New Century TRS Holdings, Inc.*, 407 B.R. 576, 592 (D. Del. 2009).

Claims for administrative expenses, however, are given special treatment in the Bankruptcy Code. They are not permitted to be placed in a class. 11 U.S.C. § 1123(a)(1) (allowing claims to be placed in a class, "other than claims of a kind specified in section 507(a)(2) . . ."). Instead, the Code explicitly requires that a plan, to be confirmable, provide that each holder of an administrative-expense claim will receive cash, on the effective date of the plan, equal to the full amount of its claim, unless the holder of the claim agrees to a different treatment. 11 U.S.C. § 1129(a)(9)(A). There are no exceptions to this rule in the statute. Indeed, because there is no need to group other creditors into classes unless the administrative-expense claimants can be satisfied in full, section 1129(a)(9)(A) has been called "the only essential confirmation requirement" for a Chapter 11 plan. 7 Collier on Bankruptcy ¶ 1129.02[9][a].

If a plan is not filed or cannot be confirmed, the Chapter 11 case may be either dismissed or converted to Chapter 7. 11 U.S.C. § 1112(b)(4)(J) & (M). If a Chapter 11 case is converted to a Chapter 7

because there are insufficient funds to pay the administrative-expense

claims in full (and those claimants did not agree to less favorable

treatment), then each administrative claimant takes a *pro rata* share of

the estate.  11 U.S.C. §§ 726(a)(1), 507.

In this case, the United States has an administrative-expense

claim for capital gains tax arising from the sale of property in

bankruptcy.  11 U.S.C. § 503(b)(1)(B)(i).  *See also* S.Rep. No. 95-989, at

66 (1978) ("[i]n general, administrative expenses include taxes which

the trustee incurs in administering the debtor's estate, including taxes

on capital gains from sales of property by the trustee").  Other

administrative-expense claims in this case include professional fees for

the attorneys and accountants for Debtor, the United States Trustee,

and the Committee of Unsecured Creditors, and the other wind-down

expenses for debtors.  11 U.S.C. § 503(b)(2), (3), and (4).  Administrative

claims are given priority over unsecured claims.  11 U.S.C. § 507(a)(2)

and (3).

Accordingly, under the priority scheme established by the

Bankruptcy Code, the proceeds from the sale of substantially all of

debtors property should have been distributed *pro rata* to the holders of

administrative-expense claims, and then, if those claims were satisfied, *pro rata* to the holders of unsecured claims. Here, in contrast, some administrative-expense claims (attorneys' fees and wind-down expenses) were paid in full; others (the capital gains tax) went entirely unpaid; yet lower-tier unsecured creditors were allowed some recovery. Debtors obtained this anomalous result by selling substantially all their assets in a sale pursuant to Section 363 of the Bankruptcy Code, and including in the Asset Purchase Agreement, and the related Term Sheet, distribution terms that differed from the priorities established by Congress in the Bankruptcy Code. As we explain in Part C, however, the courts have repeatedly held that parties may not use a Section 363 sale to alter the priorities set forth in the Code. The opposing parties (debtors, Hospital Acquisition, and the Committee of Unsecured Creditors) convinced the Bankruptcy Court that this Section 363 sale did not disrupt these priorities because the amounts paid by Hospital Acquisition to acquire substantially all the debtors' assets were not property of the estate. As we demonstrate in Part D *infra*, this conclusion is erroneous because the proceeds from the sale of substantially all a debtors' property are always property of the estate,

and, moreover, the conclusion that these monies were not such proceeds is inconsistent with the parties' own characterization of the transactions.  Finally, we explain in Part E that this appeal is not statutorily moot under Section 363(m) of the Bankruptcy Code, because this Court may modify the distribution terms contained in the Asset Purchase Agreement and the Term Sheet, and the Bankruptcy Court orders adopting those documents, without affecting the validity of the sale to Hospital Acquisition.

### C.    Parties may not use a section 363 sale or a settlement connected to such a sale to alter the priorities established by the Bankruptcy Code

The courts are not free to modify the priorities established by Congress for the payment of claims in bankruptcy.  *United States v. Noland*, 517 U.S. 535, 540 (1996) (observing that for a bankruptcy court to do so would be, in effect, for the court to take over the legislative role and revise the statute).  Nor may parties evade this scheme by using a Section 363 sale to effectively liquidate or reorganize a debtor in a manner inconsistent with the Bankruptcy Code.

It has long been recognized that "[t]he debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11

for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets." *PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935, 940 (5th Cir. 1983). *See also Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007) (sales that effectively distribute the debtor's assets "are prohibited" because of "a fear that a debtor-in-possession will enter into transactions that will, in effect, 'short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan'") (quoting *Braniff*).

In *Braniff*, as here, the debtor attempted to sell and reorganize an ongoing business in a transaction that included numerous ancillary terms.  Insofar as this transaction "changed the composition of [the debtor's] assets," the Fifth Circuit held, it was "the contemplated result [of a sale] under § 363(b)."  700 F.2d at 940.  The court reversed the District Court's approval of the transaction, however, because the ancillary terms "had the practical effect of dictating some of the terms of any future reorganization plan."  *Id.* at 940-941.  These ancillary terms thus went beyond the statutory power of the debtor in possession

to "use, sell, or lease" estate property.  *Id.*  Because the transaction had

been treated by both the bankruptcy and the district courts as an

"integrated whole," the Court in *Braniff* disallowed the entire

transaction.  *Id.* at 939.

Notwithstanding these limitations on Section 363 sales, in recent

years many debtors have relied upon Section 363 sales as substitutes

for Chapter 11 plans.  As one commentator has noted, "[r]ather than go

through the traditional protracted process of proposing a plan of

reorganization to be voted on by its various claimants, bankrupt

companies increasingly seek to sell all or substantially all of their assets

under the authority of 11 U.S.C. § 363(b), which permits the bankruptcy

court alone to approve a sale after notice and a hearing."  Jacob A. King,

*Rethinking 363 Sales*, 17 Stan. J. L. Bus. & Fin. 258, 260 (2012).

Indeed, both General Motors and Chrysler pursued this path in their

bankruptcies a few years back.  *In re General Motors Corp.*, 407 B.R.

463 (Bankr. S.D.N.Y. 2009); *In re Chrysler LLC*, 405 B.R. 84 (Bankr.

S.D.N.Y. 2009).  In those cases, however, the bankruptcy courts found

that the Section 363 sales were acceptable precisely because they did

not violate the distribution rules of the Bankruptcy Code.  *See General*

*Motors*, 407 B.R. at 495 (GM's proposed sale "does not attempt to dictate or restructure the rights of creditors of the estate"); *Chrysler*, 405 B.R. at 97 ("Not one penny of the value of the Debtors' assets is going to anyone other than First-Lien Lenders").

The priority rules must be respected by settlements as well as by section 363 sales. Reviewing a pre-plan settlement that incorporated both sale terms and distribution terms, the Second Circuit has held that "whether a particular settlement's distribution scheme complies with the Code's priority scheme must be the most important factor for the bankruptcy court to consider when determining whether a settlement is 'fair and equitable' under Rule 9019." *In re Iridium*,478 F.3d at 464. Even though the sale portion of the settlement agreement was approved in *Iridium* (on a business-purpose test), *id.* at 467, the portion of the agreement that dictated the distribution of the proceeds from the sale in violation of the absolute priority rule was reversed, *id.* at 466 (noting that "no reason has been offered to explain why any balance left in the litigation trust could not or should not be distributed pursuant to the rule of priorities"). Similarly, this Court has refused to confirm a plan in which a class of creditors agreed to transfer a portion of its

distribution from the debtor's estate to lower-tier creditors, while

leaving intervening creditors unpaid.  *In re Armstrong World*

*Industries, Inc.*, 432 F.3d 507, 513 (3d Cir. 2005 ("The plain language of

the statute makes it clear that a plan cannot give property to junior

claimants over the objection of a more senior class that is impaired.")).

In this case, debtors' sale of the property to Hospital Acquisition

gave rise to an estimated $24 million in capital gains tax liability, an

administrative expense.  Yet the Bankruptcy Court permitted the

debtors to sell substantially all of their assets pursuant to Section

363(b) even though they would not thereafter be able to confirm a

Chapter 11 plan, and even though (unlike in *General Motors* and

*Chrysler*) distributional terms included in the order of sale and the

related order of settlement provided for a distribution that violated the

priorities of the Code by paying other administrative expenses

(including private attorneys' fees) in full, and making payments to

lower-tier creditors, before paying any part of the capital gains tax.

This made the order of sale and related order of settlement an illicit *sub*

*rosa* plan of reorganization that, by all appearances, was designed to

squeeze out a substantial federal tax liability.  The distributional terms

-32-

of the sale and the settlement did not comply with the requirements of Chapter 11, and the Bankruptcy Court therefore should not have approved them.

**D.    The amounts earmarked for professional fees, for the wind-down of debtors' businesses, and for the unsecured creditors are proceeds of the sale and therefore property of the estate**

Although the distributional terms of the sale and settlement are inconsistent with the priority scheme of the Bankruptcy Code, the Bankruptcy Court and the District Court approved them on the grounds that the amounts earmarked for other administrative claimants and for unsecured creditors were not property of the estate.  That conclusion was erroneous.

1.  The Bankruptcy Code includes in property of the estate "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  It also includes the "[p]roceeds . . . of or from property of the estate."  11 U.S.C. § 541(a)(6).  *See also*, *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1313 (1st Cir. 1993) ("the proceeds of the sale of [the debtor's] assets pursuant to 11 U.S.C. § 363 were property of the estate and thus the Code governed their use and distribution.").  The amounts placed in the escrow accounts for

professional fees and wind-down expenses, and the amounts paid to the

unsecured creditors, were both expressly described in legal documents

as proceeds of the sale.  In the Asset Purchase Agreement, the seller-

retained professional fees, committee-retained professional fees, and

wind-down expenses are all expressly described as "consideration" and

part of the "purchase price" that Hospital Acquisition paid for Debtors'

assets.  (A. 96.)  The relevant paragraph of the Asset Purchase

Agreement reads as follows (A. 96):

3.1 Consideration

The aggregate consideration (the "Purchase Price") for the purchase, sale, assignment and conveyance of Sellers' right, title and interest in, to and under the Acquired Assets consist of:

(a) cash (the "Cash Consideration") in an amount equal to:

(i)  the Seller Retained Professional Fees, plus

(ii)  the Committee Retained Professional Fees, plus

(iii) the Estimated Wind Down Expenses

(b)    *            *            *            *            *

The Asset Purchase Agreement thus explicitly provides that the cash

that Hospital Acquisition is putting forward as consideration to acquire

the debtors' assets will be used to pay professional fees and wind-down

expenses.

Similarly, in its motion to the Bankruptcy Court seeking approval of the settlement, the Committee of Unsecured Creditors expressly stated that "[t]he Term Sheet represents an agreement between the Buyer, the Lenders and the Committee *to allocate proceeds derived from the sale*." (A. 519 (emphasis added).) The suggestion that these monies represent proceeds of the sale, or consideration given in exchange for the assets, is not something made up by the Government, but follows directly from the language debtors, Hospital Acquisition, and the Committee of Unsecured Creditors chose to express their own agreements and to explain those agreements to the Bankruptcy Court. *Compare In re DBSD N. Am., Inc.*, 634 F.3d 79, 95 (2d Cir. 2011) (relying on the text of the Chapter 11 plan).

The amounts placed in the escrow accounts are amounts that Hospital Acquisition chose to characterize, in the Asset Purchase Agreement – drafted with its participation (and without that of the Government) – as "consideration" and part of the "purchase price" for debtors' assets. Parties to such contracts generally are held to the characterization they elect in the contract (except insofar as they adduce "proof which in an action between the parties [to the contract]

would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.").  *Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967).  It is not unreasonable to hold Hospital Acquisition to the terms of its own agreement.  Before the sale, the debtors had control and possession of their assets, which were property of their estates, and this cash was expressly included in the consideration Hospital Acquisition had to pay to acquire the estates' property.  It was part of the *quid pro quo*: Hospital Acquisition acquired the debtors' assets only by giving all of the consideration described in the agreement.  And it makes no difference that the "cash consideration" was not paid into the debtors' bankruptcy estate.  There is nothing anomalous about treating a payment made by A to C at B's specific request as though it had been made directly to B.  If, before the sale, the assets were part of the debtors' estates, it follows that after the sale *all* of the consideration that Hospital Acquisition paid to acquire those assets was similarly part of the estates.  11 U.S.C. § 541(a)(6).

2.  A similar analysis applies to the amounts paid by Hospital Acquisition to the unsecured creditors pursuant to the Term Sheet.  As

in the case with the Asset Purchase Agreement, it was the parties themselves – Hospital Acquisition, the unsecured creditors, and debtors – who characterized these amounts as "proceeds derived from the sale" (A. 519) and who described the Term Sheet as an "agreement . . . to allocate" those proceeds "to fund" certain expenses in accord with those parties' preferred priorities (A. 519-520), rather than the priorities determined by Congress and enacted in the Bankruptcy Code. Again, some of the expenses funded are "the expenses of the Committee's professionals," – an administrative claim under the Bankruptcy Code.

The economic realities here confirm that the parties properly characterized the amounts paid to the unsecured creditors as "proceeds derived from the sale." In the Asset Purchase Agreement, which was effectively an offer at the time it was executed (it still needed the Bankruptcy Court's approval), Hospital Acquisition agreed to a price it was willing to pay to acquire the debtors' assets. It later had to increase its offer, however, to secure its successful bid. This is akin to a stalking horse bidder making its initial bid, and then getting an unexpected rival bidder. Here, it was the committee's objection, rather than a rival bidder, that stood in the way. To secure its status as the

successful bidder, Hospital Acquisition had to pay additional money. But the purchaser of property from a bankruptcy estate has no right to dictate where the money goes; its only valid concern is the total price it has to pay for the debtors' assets.

It is also relevant to consider what would have happened in the normal course of events, that is, if this Chapter 11 case had proceeded in the manner contemplated by Congress – where the debtor files a bankruptcy petition with the intent to confirm a Chapter 11 plan. An unsecured creditors committee itself has no property to offer. It has nothing other than its rights under the Bankruptcy Code, which include the right to object to proposed transactions that it believes are contrary to the interests of its constituency. And so, if the debtor seeks to sell property for an amount that the committee believes to be insufficient, the committee can object. But if the objection is successful, and a higher price is negotiated, the committee (and its constituency) do not receive the difference. The difference is estate property that must be distributed in accordance with the Code's priority rules. There is no reason why this result should not apply here simply because an end-run was made around the intended Chapter 11 process.

"In this context, substance trumps form." *In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 422 (3d Cir. 2005) (in a Chapter 11 case, holding that quarterly disbursements made to a debtors' creditors "indirect[ly]", "by an unrelated third party" should be treated as having been made by the debtor). Otherwise, parties could, by setting up third-party arrangements, avoid the Congressionally established requirements of the Bankruptcy Code. *Id.* There is no reason to treat a settlement between the parties any differently. The elimination of an estimated $24 million capital gains tax liability via the approval of a Section 363(b) sale is at least as significant a violation of the Congressionally established bankruptcy priorities as is the indirect payment scheme at issue in *Genesis*. And, in *Armstrong World Industries*, this Court rejected a Chapter 11 plan provision that would have transferred estate property to a lower-tier creditor, explaining that "[a]llowing this particular type of transfer would encourage parties to impermissibly sidestep the carefully crafted strictures of the Bankruptcy Code." 432 F.3d at 514.

3.  In sum, the entire amount Hospital Acquisition agreed to pay to acquire estate property was property of the estate.  The plain language of the statute dictates this conclusion.  11 U.S.C. § 541(a)6).

It was suggested below that, because the lenders that formed Hospital Acquisition had security interests in substantially all of debtors' property, the cash used for the escrow accounts (under the Asset Purchase Agreement) and for the payments to the unsecured creditors (under the Term Sheet) should properly be regarded as belonging to Hospital Acquisition, so that these funds never became property of the estate.  In support of this contention, the debtors below relied, in part, on *In re SPM Mfg. Corp.*, *supra*.  But the First Circuit's decision in that case defeats the central premise of the debtors' contention, because (as already noted) the court there held that "the proceeds of the sale of SPM's assets pursuant to 11 U.S.C. § 363 were property of the estate and thus the Code governed their use and distribution."  984 F.2d at 1313.  And this was so even though the secured creditor in that case "held a perfected, first security interest in all of SPM's assets except certain real estate."  *Id.* at 1307.  As this Court has already noted, *Armstrong World Indus.*, 432 F.3d at 514,

*SPM* was a Chapter 7 case.  It was only *after* the secured creditor had received its distribution under Chapter 7 that it, in accordance with a prior agreement, turned around and gave part of its distribution to a lower-tier creditor.  *See* 984 F.2d at 1313 ("once the court lifted the automatic stay and ordered those proceeds distributed to [the secured creditor] in proper satisfaction of its lien, that money became the property of [the secured creditor], not of the estate.").

The court in *SPM* could conclude that the creditors whose priorities were skipped over by the agreement would have been cut out even absent the contested agreement.  *In re Armstrong*, 320 B.R. 523, 538 (D.Del. 2005), *aff'd*, *In re Armstrong*, 432 F.3d 507, 514 (3d Cir. 2005) ("We adopt the District Court's reading of [*SPM*].").  *See also SPM*, 984 F.2d at 1312 ("Any sharing between Citizens and the general, unsecured creditors was to occur *after* distribution of the estate property, having no effect whatever on the bankruptcy distributions to other creditors.")  *And see DBSD N. Am.*, 634 F.3d at 98 (distinguishing *SPM* for the same reasons given by the Court in *Armstrong*).  And, more to the point, *SPM* did not conclude that administrative creditors could be skipped:  to the contrary, the settlement agreement in that case

applied to the "net proceeds of the sale," measured "after payment of administrative expenses," 984 F.2d at 1308, *see also id.* at 1312 (assuming the full payment of administrative expenses "under any scenario").

In contrast, here, the distribution terms of the Asset Purchase Agreement and Term Sheet skipped over the United States, which held an administrative claim, while allocating monies to other administrative claimants (*i.e.*, professional fees, including fees of the professionals retained by the unsecured creditors committee, and wind-down expenses). Indeed, the order approving the sale provided that these fees would be approved by the Bankruptcy Court as usual. (A. 60-61). This is a far cry from the side payment approved in *SPM*, which was measured after administrative expenses were paid and which (the First Circuit held) could have taken place entirely outside of bankruptcy and arguably should not even have been administered by the trustee. *See* 984 F.2d at 1319.

Under the Bankruptcy Code, all of the administrative claims – professional fees and tax liabilities alike – should have been entitled to the same treatment; if the estate was inadequate, they should have

been paid *pro rata.* Hospital Acquisition and the other parties should

not be allowed to elect to pay some administrative claims and not others

– and it certainly may not elect to pay unsecured creditors without first

paying the administrative claims in full.

**E.    Modification of the distribution terms in the sale and settlement orders will not affect the validity of the sale to the purchaser**

Section 363(m) of the Bankruptcy Code provides that "[t]he

reversal or modification on appeal" of an order authorizing a sale under

Section 363(b) "does not affect the validity of a sale or lease . . . to an

entity that purchased or leased such property in good faith, unless such

authorization and such sale or lease were stayed pending appeal." This

Court has recognized that Section 363(m) "was created to promote the

policy of finality of bankruptcy court orders, and to prevent harmful

effects on the bidding process resulting from the bidders' knowledge

that the highest bid may not end up being the final sale price." *Krebs*

*Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 500 (3d

Cir. 1998).  The United States neither sought nor obtained a stay of the sale itself.[2]

Several courts follow a *per se* rule, holding that § 363(m) moots all appeals in the absence of a stay.  This Court, however, has rejected that rule.  *Krebs Chrysler-Plymouth*, 141 F.3d at 499 ("We reject the *per se* rule.").  Instead, reading section 363(m) through the analogous section 364(e), analyzed by the Court in *In re Swedeland Dev. Group, Inc.*, 16 F.3d 552 (3d Cir. 1994) (*en banc*), this Court reasoned that the language of 363(m) itself contemplated the possibility of an appeal in the absence of stay.  *Id.*  Instead, this Court concluded that an appeal would be moot only if there was no stay and "the court, if reversing or modifying the authorization to sell or lease, would be affecting the validity of such a sale."  *Id.*  *See also Cinicola v. Scharffenberger*, 248 F.3d 110, 128 & n.20 (3d Cir. 2001) (following *Krebs* and discussing *Swedeland*).

In *Krebs*, this Court concluded that both forms of relief sought in that case would affect the validity of the sale, the first (reversal of an

---

[2]  Nor do we imagine that any such stay would have been granted, given the necessity of keeping the acute-care facilities operating to protect their patients.

order allowing another party to reject a buy-sell agreement) because it would undermine title to a Jeep-Eagle franchise, the second (recoupment, credit, or refund of the amount paid under the agreement before it was rejected) because it would be an attack on the sale price. 141 F.3d at 499-500).  The relief the United States seeks here is distinguishable.  We are not seeking to undermine Hospital Acquisition's title to the assets it acquired from debtors, nor are we seeking to change the amount that Hospital Acquisition paid out in connection with those acquisitions.

We are seeking only a recession of ancillary terms, *to wit*, the terms in the order of sale and Asset Purchase Agreement and the Term Sheet that provide for funds to be transferred from Hospital Acquisition to third parties in a manner inconsistent with the distribution rules of the Bankruptcy Code.  Such ancillary terms may be attacked on appeal in the absence of a stay, notwithstanding § 363(m).  *See Cinicola* 248 F.3d at 128 (concluding that an order of sale could be modified, even in the absence of a stay, if the ancillary term could be reversed or modified without affecting the validity of the sale).  In the words of the Second Circuit, these are "challenges to the Sale Order that are so divorced

from the overall transaction that the challenged provision would have affected none of the considerations on which the purchaser relied." *In re WestPoint Stevens, Inc.*, 600 F.3d 231, 249 (2d Cir. 2010).

To be sure, Hospital Acquisition may have negotiated its agreements with debtors and the unsecured creditors on the understanding that the debtors' large capital gains tax liability would not have to be paid. But requiring the taxes to be paid out of the funds that Hospital Acquisition has already agreed to pay to *someone*, in order to acquire substantially all the debtors' assets, would not fundamentally change the deal that Hospital Acquisition agreed to. Whether it would have changed the deal that debtors, or the unsecured creditors, would have agreed to is beside the point – section 363(m) provides that reversal or modification on appeal does not affect the validity of the sale *as to the purchaser*: "the reversal or modification on appeal of an authorization under subsection (b) . . . of this section . . . of a sale . . . of property does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith . . . "

Cases holding that ancillary terms to a sale are integral to the parties' bargained-for exchange concern ancillary terms that affect the

purchaser's rights going forward – they do not, as here, allow the purchaser to control the disposition of monies that the purchaser has already agreed to part with. *See In re Trism*, 328 F.3d 1003, 1007 (8th Cir. 2003) (ancillary term concerned purchaser's exposure to successor liability); *In re Stadium Mgmt. Corp.*, 895 F.2d 845, 1007 (1st Cir. 1990) (ancillary term concerned assumption and assignment of certain leases associated the operation of Foxborough Stadium, which was the real property purchased). *See also Cinicola v. Scharffenberger*, 248 F.3d at 128 (where the ancillary term concerned assumption and assignment of physician employment contracts, remanding for determination whether such contracts were integral to the purchaser's agreement to purchase certain hospitals). To go beyond this, and hold that a purchaser may bargain for a particular distribution of the amounts it has already agreed to pay out in order to acquire property of the estate, would allow the purchaser to rewrite the Bankruptcy Code. *Cf. Noland*, 517 U.S. at 540 (holding that courts may not rewrite these priorities). Courts therefore have held that review of an order distributing the proceeds of a sale therefore is not barred by § 363(m). *In re Hope 7 Monroe St. Ltd. Partnership*, 743 F.3d 867, 872 (D.C. Cir. 2014) (§ 363(m) does not

prevent the Court of Appeals from reopening an order "directing the

distribution of proceeds" from a sale). *See also BMG Music v. Martinez*,

74 F.3d 87, 89 n.3 (5th Cir. 1996).  The fact that Hospital Acquisition

placed the distribution terms in the same document as the sale

agreement should not produce a different result.

## CONCLUSION

For the foregoing reasons, the orders of the District Court should be reversed, and the case remanded to the Bankruptcy Court for modification of the Sale Approval and Settlement Approval Orders, and for distribution of the property of the estate in accord with the priorities established in the Bankruptcy Code.

Respectfully submitted,

TAMARA W. ASHFORD
  *Acting Assistant Attorney General*

/s/ Bethany B. Hauser

THOMAS J. CLARK          (202) 514-9084
BETHANY B. HAUSER        (202) 514-2830
  California Bar No. 223074
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

*Of Counsel:*
CHARLES M. OBERLY, III
  *United States Attorney*

OCTOBER 2014

11949244.1

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Rule 28.3(d), it is hereby certified that, because the attorneys on this brief represent the Federal Government, the requirement that at least one attorney must be a member of the Bar of this Court is waived.

/s/ Bethany B. Hauser
BETHANY B. HAUSER
*Attorney for the Appellant*

-50-

# CERTIFICATE OF COMPLIANCE
# WITH TYPE VOLUME LIMITATION

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[X]  this brief contains **9,122** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ]  this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X]  this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook, *or*

[ ]  this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

3.  The undersigned hereby further certifies that the foregoing brief filed electronically with the Court is in PDF searchable format, that the text of the PDF copy is identical to the text of the paper copy, that the PDF version has been electronically scanned for viruses with the Trend Micro OfficeScan 10.0 program (updated daily), and that, according to the program, no viruses were detected.

 /s/ Bethany B. Hauser

Attorney for the United States

Dated:    October 9, 2014

## CERTIFICATE OF SERVICE

It is hereby certified that on October 9, 2014:  (1) seven copies of this brief were sent by First Class Mail to the Clerk; and (2) a PDF copy was electronically filed by CM/ECF.


    /s/ Bethany B. Hauser
    BETHANY B. HAUSER
    *Attorney*